STATE OF NEBRASKA, APPELLEE, V. EDWIN KULA,
ALSO KNOWN AS ED KULA, APPELLANT.

562 N.W.2d 717

Filed May 9, 1997.    No. S-96-301.

Mark M. Sipple, of Sipple, Hansen, Emerson & Schumacher, and Adam J. Sipple for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

CONNOLLY, J.

Edwin Kula was convicted by a jury of the first degree murder of Jerry Carlson and the use of a weapon to commit a felony. The district court for Platte County sentenced Kula to life in prison for murder and to a mandatory consecutive term of 6⅔ to 20 years' imprisonment for the use of a weapon to commit a felony.

Because of the State's repeated prejudicial discovery violations, we determine that the district court erred in failing to grant Kula's motion for a continuance prior to opening statements and his motion for new trial following the verdict. As a result, we reverse, and remand for a new trial.

## I. BACKGROUND

### 1. DISCOVERY OF CARLSON'S BODY

On the evening of April 15, 1994, Carlson and his friend Frank Cuba worked on a golf cart at Cuba's auto body repair shop in Silver Creek, Nebraska. Carlson left the shop in his Chevrolet pickup between 11:30 and 11:45 p.m. and turned west on Highway 30 toward Clarks, Nebraska.

At approximately 1:15 or 1:30 a.m. on April 16, Tom Branting stopped at the residence of John Wirrick, village marshal for Clarks, and told Wirrick that there was a vehicle, possibly belonging to Carlson, about 2 miles east of Clarks in a ditch adjacent to Highway 30. Wirrick then contacted the Merrick County Sheriff's Department and met Chief Deputy Richard Miller at the scene.

The officers discovered a pickup with the headlights on and the engine running approximately 20 to 50 yards south of

Highway 30, resting on a tree in a ditch containing a foot of water. The officers found Carlson dead in the pickup with a wound in his back just underneath the left shoulder blade. The rear driver's-side window on the extended portion of the cab was broken out by a single bullet from a high-powered rifle that pierced through the driver's seat, entered Carlson's back, and penetrated his chest.

Originally, Branting and Charles Johnson were arrested for, and charged with, second degree murder in the death of Carlson. The cases were subsequently dismissed.

## 2. ACTIVITIES OF KULA ON APRIL 15

On the evening of April 15, Kula and his 15-year-old son, Travis, visited two bars in Silver Creek. They ate at the Kozy Bar and then went to Li'l Joe's for approximately 3 or 4 hours. Travis did not know what time he and Kula left Li'l Joe's in the Kulas' Dodge minivan, but it "seemed pretty late."

At Kula's direction, Travis drove south out of Silver Creek and then turned around and came back through town. They came to an intersection where they saw two men walking. When Kula saw the two men, Travis noticed that Kula's face changed expressions like "he wasn't real pleased with something." Kula referred to one of the men as being Carlson (the other being Cuba) and then told Travis to turn right. As the minivan approached the two men at approximately 10 to 15 miles per hour, Kula grabbed the steering wheel and turned the minivan within inches of hitting them. Travis asked Kula what was going on and received no reply.

Travis then drove to the Kula farmhouse 3 miles east and one-half mile north of Silver Creek. The trip from Silver Creek to the Kula home takes approximately 10 minutes. When they arrived home, Kula indicated to Travis that he was going back out and said that he did not want Travis to be a witness and have to testify in court and that he (Kula) was going to take care of business. Travis went straight to his room.

Kula's wife, Rose, heard Kula and Travis arrive home between 11:20 and 11:30 p.m. She did not see Kula, but heard someone go back outside. Rose then heard the minivan "[take] off a little fast," looked out the window, and saw the minivan

drive over to the garage. She woke Travis and asked him what was going on. Travis told her that she did not want to know, and she responded that she did. Travis eventually told Rose that Kula was upset with Carlson.

From Travis' window, Rose watched the minivan drive to the end of the farm lane and sit for approximately 5 to 7 minutes. She then left Travis' room and went to the garage to see if any guns were missing. She noted that a .22-caliber pistol was missing that she had seen in the garage earlier that afternoon and that a .22-caliber rifle was missing that Kula had used to shoot birds earlier that day. When Rose saw that the guns were gone, she became concerned, so she and the children went to a Columbus hotel for the night. Rose stated that if Kula was in a bad mood, she "didn't want to be home when he got home."

### 3. ACTIVITIES OF BRANTING AND JOHNSON ON APRIL 15

On April 15 at approximately 7 p.m., Branting and Johnson went together to the Kozy Bar in Silver Creek. According to Branting and Johnson, the following occurred: They left the bar at approximately 11 p.m. and drove west to Clarks in Johnson's Chevrolet pickup. Branting noticed a car following them that he believed to be that of Rhonda Braun, whom Johnson had been dating. When they got to Clarks, they confirmed that it was Braun's blue Oldsmobile behind them.

At approximately 11:10 or 11:12 p.m., Johnson dropped Branting off at Branting's home in Clarks, where he lived with his sister Juanita Engel and his nephew Trent Engel. Then, with Braun driving, Branting got into her car, and they followed Johnson out to the house of Amy Johnson, Johnson's ex-wife, approximately 3 miles northeast of Clarks. According to Johnson, when he arrived at the house of Amy Johnson, with whom he was attempting to reconcile, her clock said 11:45 p.m., and her clocks are 15 minutes fast. Amy Johnson, who had dated Carlson, testified that when Johnson arrived at her house, her clock showed about 12 midnight, but her clocks are 5 to 10 minutes fast.

Branting rode with Braun back to Clarks. They then drove through Clarks, went to Polk for beer and cigarettes, went back

to Silver Creek, and then headed back west to Clarks. Approximately 3 miles east of Clarks, they noticed a vehicle off the road. Branting, wearing boots, waded down to the vehicle in ankle-deep water and determined that it was Carlson's pickup. He looked inside, saw blood and no movement from Carlson, and then went back to Braun's car. Branting and Braun then drove to Wirrick's residence in Clarks.

### 4. BASIS FOR ORIGINAL CHARGES AGAINST BRANTING AND JOHNSON

In reporting what he observed, Branting told Wirrick only the whereabouts of the vehicle and that it possibly belonged to Carlson. He did not report that he had gone down to the pickup or that he had seen a body or blood in the pickup. Braun then took Branting home, where he encountered his nephew Trent Engel, who noticed that Branting was wearing penny loafers or some type of dress shoes and was not wearing boots.

Braun was interviewed by the police prior to Branting's and Johnson's being charged. She also testified under oath at both Branting's and Johnson's preliminary hearings, at Kula's grand jury proceeding, and during a pretrial deposition taken by Kula's counsel. During her first interview with Merrick County Deputy Sheriff Rod Williamson and at all subsequent legal proceedings, Braun essentially corroborated the trial testimony of Branting and Johnson—that she followed them on Highway 30 from Silver Creek to Branting's sister's house in Clarks and that nothing unusual happened on the way.

However, prior to Braun's testifying in any legal proceeding, Williamson conducted a second interview with her at the Platte County sheriff's office. During this interview, Braun made statements that differ from those she made during her first interview and from her testimony at the subsequent legal proceedings. Williamson's written report of this second interview was not admitted into evidence at trial, and Braun's statements were not allowed to be used by the defense to impeach her after she was called as a witness by the defense. Williamson's report stated that Braun told him that as she was following Branting and Johnson in her car, as they were heading westbound toward Clarks in Johnson's pickup,

she then saw Mr. Johnson['s] vehicle swerve into the eastbound lane and another set of tail lights appeared. Mr. Johnson['s] vehicle then went around the second vehicle then the second vehicle swerved and the lights disappeared. She was then behind Mr. Johnson's vehicle again. She then came across a vehicle in a field on the south side of the highway with [its] lights on.

. . . .

I then asked her if she was in love with Mr. Johnson? Miss Braun began to cry and stated "yes". I then asked her if that was why she did not tell me the truth the first time I talked to her? She stated "yes". I then asked if she was telling me everything now?

She stated "yes I'll take a lie detector test too if you want". I then asked if she would be willing to take a polygraph if I would set it up? She stated "yes".

I then asked her why she didn't tell me the truth the first time? She stated that she didn't want to get Mr. Johnson in trouble.

During an offer of proof outside the presence of the jury, Braun admitted making these statements to Williamson. However, Braun stated that she made the statements only "after they kept telling me and trying to get me to say that." She elaborated that law enforcement officers put pressure on her, threatened to take her to jail, and treated her poorly. However, Braun also admitted that she essentially repeated these statements 2 hours later to Investigator Mike Phinney of the Nebraska State Patrol in Grand Island, and that, in her opinion, Phinney did not mistreat her in any way.

At trial, Braun was called as a witness only by Kula and testified that she did not see any other westbound vehicles on Highway 30 besides Johnson's pickup. However, she testified that as she was following Branting and Johnson, she saw Johnson's pickup swerve "a little bit" left of the centerline and that she saw "a glimpse of light" on the south side of the field in the area where Johnson made this swerve and where Carlson's pickup was later found.

Shannon Lerch was at the Kozy Bar on the evening of April 15. Lerch testified for Kula that Branting and Johnson left the

bar when she did, which was 11:30 p.m., not 11 p.m. Sheila Cermak was also in the Kozy Bar that evening and testified for the defense that she left between 11:15 and 11:30 p.m. and that Branting and Johnson left at the same time.

Joan Sock lived 2 miles west of Silver Creek on the south side of Highway 30. Sock was called as a witness by the State and testified that she heard what sounded like a gunshot somewhere to the east of her house on the night of April 15, 1994. She stated that she did not know exactly what time it was, but that she lay down on her sofa at 11:10 p.m. and that sometime after that she heard the sound. After she heard the sound, she waited a minute to a couple of minutes and then looked out her window facing Highway 30. She saw two sets of taillights approximately half a mile west of her house, both heading west. The two sets of taillights were close together, and Sock thought that one vehicle was about ready to pass the other. She could not identify the vehicles. She also observed a light-colored smaller car behind the two sets of taillights that turned off on a road going northwest.

Ken Dittmer, another witness called by Kula, lived in Clarks. On the evening of April 15, Dittmer, his wife, and another couple were playing cards. At about 11:25 p.m., Dittmer and his male companion went to Clarks to get more beer but were unable to find an open establishment. Dittmer and his friend then left for Silver Creek, traveling east on Highway 30, with his friend driving. Approximately halfway between Clarks and Silver Creek, Dittmer saw two westbound vehicles which he identified as being "Chevy" pickups. He testified that these vehicles were moving fast and traveling 5 to 10 feet apart, essentially bumper to bumper. Approximately 2 miles behind the Chevrolet pickups, and also proceeding westbound, was a blue car. The record reflects that both Carlson and Johnson were driving Chevrolet pickups and that Braun was driving a blue Oldsmobile on April 15.

At trial, Branting and Johnson were called as witnesses by the State and denied any involvement in the death of Carlson. The record does not reflect that either of them asked for or received any immunity for their trial testimony.

## 5. Statements Made by Kula After April 15

The day after Carlson was murdered, Kula brought up the subject of Carlson's death to Rose and said that he was upset with Carlson about some of the teasing that Carlson did at work. Rose also testified that Kula said something about having a "blackout" the night that Carlson was murdered. Rose had never heard of Kula having blackouts. Rose never asked Kula if he took any guns with him when he left the house in the minivan. Rose also stated that Kula said that it was a coincidence that he was "going to go with the intent to do bodily harm" to Carlson and that Carlson was killed.

Rose stated that both she and Kula had known Carlson for years. Kula had worked with Carlson at Watts Electric in Osceola for approximately 6 or 7 weeks, a job Kula had quit before Carlson was murdered. As of April 15, Kula had been employed with Grosch Irrigation for approximately 1 month. Rose also stated that her husband had said that Carlson was "okay," but that he had also indicated that he did not care for Carlson because Carlson liked to tease people. She said that it was possible that he had said this within 1 month of the date of Carlson's murder.

Kula was interviewed by Investigator William J. Mach of the Nebraska State Patrol on November 16, 1994. Kula admitted that he and Travis saw Carlson and Cuba walking the night that Carlson was murdered and that he grabbed the steering wheel and swerved toward them as a joke. Kula told Mach that after Travis drove him home, he went into the house to check for more beer and then went back to town and bought a couple of sodas. He drove around for approximately 15 minutes, then went home to find the family gone. He stated that the youngest boy had recurring health problems, so he thought perhaps they had taken him to the doctor. He waited a bit, then called two of his wife's sisters and her mother to try and find Rose, but was unable to, so he went to sleep. The next morning, he went and picked up his last paycheck from Watts Electric and learned of Carlson's murder.

Kula also admitted that he was "tearing around some" with the minivan and that that was not unusual after he had been drinking. He stated that he did not have any guns with him that

night and that all the guns he had were in the house and not in the garage. Kula admitted to having alcohol-induced blackouts. He did not remember why he went into his garage that night. The jury also heard that Kula stated during the interview that he did not think he had anything to do with Carlson's death, but "there's a part of a percent where I know I blacked out and, you know, just kinda worried about that." Unbeknownst to the jury, this statement was made in the context of refusing repeated requests to take a polygraph examination.

### 6. Terni Carcano Rifle

Jay Richards, formerly the chief of the Clarks Police Department, testified that 4 years earlier, on April 16, 1990, he went to the Kula residence and was given three guns by Rose for safekeeping. He took the guns to the police department, inventoried them, and secured them in the police evidence locker. Approximately 1 to 1½ months later, Rose came to the police department and asked that the guns be returned. An inventory sheet was received as exhibit 61 and shows that one of the guns that Rose had given to Richards for safekeeping was a "1941 XIX Terni, Italy, B61070."

At trial, Sgt. Mark S. Bohaty, a firearms examiner for the Nebraska State Patrol, testified that he examined three bullet fragments taken from Carlson's body. He described the condition of the three fragments and stated that based on his research and experience, there was not enough of the fragments left to determine what caliber the bullet had been.

Bohaty did state that in his opinion the gun that fired the fatal bullet was a center-fire, high-powered rifle and not a rim-fire rifle, such as a .22-caliber rifle. Bohaty expressed the opinion that a Terni Carcano 6.5-mm rifle would be capable of firing the bullet that killed Carlson, but that there are millions of guns in existence in the United States that would have been capable of firing the fatal bullet. Using a Terni Carcano rifle, Bohaty demonstrated to the jury that after a shot is fired, the spent cartridge is not extracted and that a new cartridge is not inserted into the chamber until the rifle's bolt is manually operated.

During his interview with Mach, Kula denied that he ever owned a gun known as a Terni Carcano or a gun made in Terni,

Italy. However, Ed Staniec, Kula's brother-in-law, and Gary Bialas, Kula's nephew, both testified that they had seen Kula in possession of a Terni Carcano rifle. Bialas also stated that Kula usually made him aware of his gun trades or sales and that he was not aware that Kula had traded, sold, or disposed of the Terni Carcano rifle.

Dr. Matthias I. Okoye, a pathologist in Lincoln, was called as a witness by the State and gave the opinion that after being shot, Carlson could have functioned for 4 to 7 minutes and could have driven his vehicle along a straight highway during that period of time. Dr. Charles S. Petty, a pathologist from Dallas, Texas, was called as a witness by Kula and gave the opinion that Carlson would have lost consciousness within a minute or less after being shot and would not have been able to consciously drive his vehicle down a straight road.

## II. ASSIGNMENTS OF ERROR

Restated, Kula asserts that the district court erred in (1) overruling his motions to dismiss because the State failed to establish a prima facie case that Kula killed Carlson; (2) failing to dismiss the prosecution or impose appropriate sanctions upon the State for its repeated failure to provide material and/or exculpatory evidence prior to trial; (3) overruling Kula's motion for new trial; (4) sustaining the State's objection to Kula's cross-examination of Branting concerning the fact that Branting demanded and received immunity prior to giving deposition testimony in these proceedings; (5) sustaining the State's motion in limine, precluding Kula from eliciting testimony from Dittmer (adduced under hypnosis) concerning the color of the two Chevrolet pickups he witnessed traveling westbound between Silver Creek and Clarks; (6) sustaining the State's objection and precluding Kula from impeaching Braun with the statements she made to law enforcement officers during two separate interviews concerning what she saw on the night of Carlson's murder; (7) overruling Kula's motion to strike the testimony of Travis after the State improperly impeached Travis with prejudicial prior unsworn statements which were not previously disclosed to Kula and included statements which were never made by Travis; (8) overruling Kula's hearsay and

improper impeachment objections to testimony from Rose concerning prior statements by Travis that were previously admitted to by Travis, had virtually no impeachment value, and were highly prejudicial; (9) overruling Kula's objection to the State's impeachment of Rose with her grand jury testimony compelled over her exercise of the marital privilege; (10) overruling Kula's objection to the State's prejudicial and irrelevant demonstration before the jury of the operation of a Terni Carcano rifle; (11) overruling Kula's objections to Mach's testimony concerning his reenactment tests made from the Grosch Irrigation driveways (south of Highway 30) despite the lack of any evidence that Kula was ever west of Silver Creek on the night of the homicide; (12) overruling Kula's objection to Mach's testimony concerning travel times and distances between Kula's home and the Grosch Irrigation driveways despite the lack of any evidence that Kula was ever west of Silver Creek on the night of the homicide; (13) instructing the jury that Kula had been indicted on the charges upon which he stood trial and that they should not find Kula guilty "unless and until" the jury found that the State proved his guilt beyond a reasonable doubt; (14) instructing the jury on the lesser-included offenses of second degree murder and manslaughter, despite the absence of any evidence supporting those charges; and (15) refusing Kula's instruction concerning his alibi defense.

Because of our ruling, we analyze only Kula's first three assigned errors.

## III. STANDARD OF REVIEW

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Cody*, 248 Neb. 683, 539

N.W.2d 18 (1995); *State v. Pierce*, 248 Neb. 536, 537 N.W.2d 323 (1995).

An appellate court reviews a ruling on a motion to continue for an abuse of discretion by the trial court. See *State v. Null*, 247 Neb. 192, 526 N.W.2d 220 (1995).

In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Severin*, 250 Neb. 841, 553 N.W.2d 452 (1996); *State v. McBride*, 250 Neb. 636, 550 N.W.2d 659 (1996).

## IV. ANALYSIS

### 1. SUFFICIENCY OF EVIDENCE

Kula first asserts that the district court erred in overruling his motion to dismiss at the close of the State's case and again at the close of all the evidence for the reason that the State had not established a prima facie case that Kula killed Carlson.

In our determination whether Kula's motion to dismiss for insufficient evidence should be sustained, the State is entitled to have all of its relevant evidence accepted as true, the benefit of every inference that reasonably can be drawn from the evidence, and every controverted fact resolved in its favor. See, *State v. Glantz*, 251 Neb. 947, 560 N.W.2d 783 (1997); *State v. McDowell*, 246 Neb. 692, 522 N.W.2d 738 (1994).

The State's case against Kula consisted solely of circumstantial evidence. No confession was made, no eyewitness was discovered, no murder weapon was found, and no other physical evidence was adduced. However, circumstantial evidence is not inherently less probative than direct evidence. *State v. Pierce, supra*; *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981). In finding a defendant guilty beyond a reasonable doubt, a jury may rely upon circumstantial evidence and the inferences that may be drawn therefrom. *State v. Thompson*, 244 Neb. 375, 507 N.W.2d 253 (1993).

Construed most favorably to the State, the evidence shows that after Kula and Travis left the bar in Silver Creek, they saw Carlson and Cuba walking down the street. Travis noticed that Kula's face changed expressions like "he wasn't real pleased with something" and that Kula referred to one of the men as

being Carlson. As the minivan approached Carlson and Cuba, Kula grabbed the steering wheel and turned the minivan within inches of hitting them.

When Kula and Travis arrived home, Kula said to Travis that he did not want Travis to be a witness and have to testify in court, and that he (Kula) was going to take care of business. Rose heard Kula and Travis arrive home between 11:20 and 11:30 p.m. She then heard the minivan "[take] off a little fast" and looked out the window and saw the minivan drive over to the garage. Rose asked Travis what was going on, and Travis told her that Kula was upset with Carlson. From Travis' window, she watched the minivan drive to the end of the farm lane and sit for approximately 5 to 7 minutes. Cuba testified that Carlson left Cuba's shop between 11:30 and 11:45 p.m.

The day after Carlson was murdered, Kula brought up the subject of Carlson's death to Rose and said that he was upset with Carlson about some of the teasing that Carlson did at work. Kula also told Rose that he had a blackout and that it was a coincidence that he was "going to go with the intent to do bodily harm" to Carlson and that Carlson was killed.

Kula had recently quit his job where Carlson also worked. Rose stated that possibly within 1 month of the date of Carlson's murder, Kula had said that he did not care for Carlson because Carlson liked to tease people.

In addition, in response to requests during an interview with Mach to take a polygraph examination, Kula stated that he did not think he had anything to do with Carlson's death, but "there's a part of a percent where I know I blacked out and, you know, just kinda worried about that." While Kula denies ever owning a Terni Carcano rifle, police records show that Kula previously owned a Terni Carcano rifle that Bohaty testified would be capable of firing the fatal bullet.

While the evidence adduced against Kula is not overwhelming, viewed and construed most favorably to the State, the circumstantial evidence shows that Kula had the motive and opportunity to commit the murder and is sufficient to support the conviction. Accordingly, the district court did not err in overruling Kula's motions to dismiss.

## 2. Motion for Continuance

Kula next asserts that the district court erred in failing to dismiss the prosecution or impose appropriate sanctions upon the State for its repeated failure to produce material and/or exculpatory evidence prior to trial. Kula contends that the State's untimely disclosures violated the court's discovery order, see Neb. Rev. Stat. § 29-1912 (Reissue 1995), and his rights as guaranteed by the U.S. and Nebraska Constitutions.

On August 3, 1995, Kula filed a discovery motion, requesting in addition to the materials enumerated in § 29-1912, that the State provide "separate and apart from other discovery material, all evidence of any kind or nature whatsoever that may be exculpatory . . . pursuant to *Brady v. Maryland*, 373 U.S. 83, [83 S. Ct. 1194, 10 L. Ed. 2d 215] (1963)." Following Kula's arraignment on August 21, the court heard argument on the matter of discovery, and Kula's counsel stated that

> in this case the exculpatory evidence is available to the state readily because they had to have exculpatory evidence to file charges against the two other individuals, Mr. Johnson and Mr. Branting, by the very nature of the fact that they . . . filed murder charges in this court, they have to have exculpatory evidence. Any evidence that they use to charge those two individuals, by it's very nature, would be exculpatory to Mr. Kula. Rather than just hand us a big huge amount of discovery material, which I anticipate that they have and that we'll receive, and have us sort out what's exculpatory and what's not isn't right and would prejudice the defendant because it would delay his ability to prepare for trial.
>
> Instead, we're asking that the court order that they separate out for us that information that they used to file charges against those two individuals.

That same day, the court granted Kula's discovery motion in its entirety without objection. On the belief that Kula had not received the materials ordered to be produced, Kula's counsel issued a subpoena duces tecum to the State's investigators for the production of their entire police reports. On November 6, 1995, the court heard argument on the State's motion to quash the subpoena duces tecum. At the hearing, Special Prosecutor

Charles W. Campbell stated that "the police work reports just are not discoverable," that "items that may reasonably lead to relevant evidence" are not discoverable in a criminal case, and that "we have provided [Kula] with all of the statutory discoverable items ordered by this court." The district court sustained the State's motion to quash Kula's subpoena duces tecum.

On November 15, Kula filed a motion for reconsideration of the court's order regarding the police reports prepared when the focus of the investigation was on Branting and Johnson. On November 22, a hearing was held on this motion, during which Campbell stated that discovery "is not supposed to be all one-sided" and that "we've given the defense every report that is conceivably exculpatory." That same day, the district court sustained Kula's motion, stating, "[T]he police reports that were prepared to point to . . . former defendants, Branting and Johnson, would be exculpatory and, therefore, I'm going to order that they be produced."

On November 27, the first day of trial, the State filed a certificate of compliance concerning the discovery material prescribed by statute without any reference to the additional material concerning the investigation of Branting and Johnson that was ordered to be turned over to the defense. That day, the State produced police reports concerning the investigation of Branting and Johnson that included (1) statements made by Mark Prososki to law enforcement officers that Johnson had a gun in his truck in the weeks prior to the shooting; (2) a report which led to the discovery of Cermak and Lerch, who testified that Branting and Johnson left the bar at approximately 11:30 p.m., not 11 p.m., as Branting and Johnson stated; (3) information from Trent Engel suggesting Branting had changed shoes sometime after discovering Carlson's body and prior to returning home with Braun at approximately 1:45 a.m.; and (4) information from Kim Koza relating an incident in the weeks prior to Carlson's death wherein Branting and Johnson had expressed hatred of Carlson because Carlson dated Johnson's ex-wife.

On the second day of trial, Kula moved to dismiss and to continue opening statements so that he could discuss the aforementioned witnesses' testimony in his statements. The district court overruled the motions, stating, "[I]n my reading of the reports I

do not find that there is exculpatory and bring out [sic] all the new things that you claim, counsel. Therefore, your motion's overruled."

Kula does not assign the district court's failure to grant his motion for a continuance prior to opening statements as error. While Neb. Rev. Stat. § 25-1919 (Reissue 1995) and Neb. Ct. R. of Prac. 9D(1)d (rev. 1996) provide that consideration of the cause on appeal is limited to errors assigned and discussed by the parties, that same statute and rule permit this court to note any plain error not assigned. *Perrine v. State*, 249 Neb. 518, 544 N.W.2d 364 (1996). Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *State v. Williams*, 247 Neb. 878, 530 N.W.2d 904 (1995); *State v. Campbell*, 247 Neb. 517, 527 N.W.2d 868 (1995).

Thus, the issue presented is whether Kula was prejudiced by the district court's failure to grant a continuance after the State failed to produce the aforementioned reports until the first day of trial. While *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995), impose a constitutional mandate for disclosure in criminal cases, a statutory design for discovery such as § 29-1912 can exact more than the constitutional minimum, so that courts must focus on information potentially useful to the defense. See *State v. Brown*, 214 Neb. 665, 335 N.W.2d 542 (1983). Under § 29-1912, whether a prosecutor's failure to disclose evidence results in prejudice depends on whether the information sought is material to the preparation of the defense, meaning that there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses, corroborating testimony, or assisting impeachment or rebuttal. *State v. Null*, 247 Neb. 192, 526 N.W.2d 220 (1995). See *State v. Brown, supra*.

In the instant case, the State was fully aware that the court's order required the production of police reports that were prepared to point to Branting and Johnson. Certainly, the State would have also been aware that these reports would lead to the

discovery of Prososki, Cermak, Lerch, and Engel as witnesses and were thus clearly "material" as defined in *State v. Null, supra,* and *State v. Brown, supra.*

We have previously stated that the discovery process is not a game of "hide the ball" and that discovery orders must be completed in a timely manner. *State v. Neujahr,* 248 Neb. 965, 540 N.W.2d 566 (1995). See, also, Model Rules of Professional Conduct Rule 3.8(d) (1995). Because the State did not produce the material reports until the first day of trial, Kula was unable to outline certain witnesses' testimony in his opening statements. Furthermore, Kula's counsel should not have been forced into investigating the content of the reports by night while defending against a murder charge by day. In effect, Kula's counsel was put in the position of trying this case on the run.

The suppression of this material evidence until the first day of trial was a violation of § 29-1912 and the court's discovery order. Accordingly, the district court abused its discretion and committed plain error in failing to grant a continuance until Kula could adequately investigate the reports and prepare his defense.

### 3. MOTION FOR NEW TRIAL

Next, Kula asserts that the district court erred in overruling his motion for new trial. An appellate court reviews a motion for new trial on the basis of prosecutorial misconduct for an abuse of discretion by the trial court. *State v. Thompson,* 246 Neb. 752, 523 N.W.2d 246 (1994).

Shortly after the jury returned its guilty verdict, Kula's counsel discovered the existence of three red notebooks in the possession of Merrick County Sheriff Dan Schneiderheinz. At the hearing on Kula's motion for new trial, Kula called Schneiderheinz as a witness. In response to the State's objection to calling a new witness and submitting new evidence, the trial court stated, "The thing that concerns me about this, counsel, is all the way through the trial there's been a failure of the State to comply openly with the discovery statutes and, therefore, this may be highly irregular, but I'm going to permit it."

Schneiderheinz testified that the notebooks were compiled at a time when the focus of the investigation into Carlson's mur-

der was on Branting and Johnson. Included in the notebooks was a note by Schneiderheinz stating, "[F]ollow up Helgoth report of receiving calls stating, 'Chuck and Tom did it.'" Schneiderheinz testified that James Helgoth told him that an anonymous female party called the Helgoth residence and stated that Branting and Johnson shot Carlson.

James and Judy Helgoth each submitted affidavits which state in pertinent part that they are residents of Clarks and that their children were very good friends of Carlson. On the day Carlson's body was found, Judy received a call from an anonymous female caller saying, "'Johnson did it, and he wasn't alone either.'" Judy told James about the phone call, and James called the Merrick County sheriff's office. Schneiderheinz called back 2 days later, and Judy told him about the phone call. Approximately 2 months later, a Merrick County deputy sheriff, Williamson, called Judy and further discussed the phone call.

During the hearing on the motion for new trial, Kula's counsel asked Schneiderheinz the following questions and received the following answers:

Q Do you know whether that [Helgoth] information was furnished to [Merrick County Attorney Dale] Shotkoski or not?

A He knew about it, yes.

. . . .

Q And whatever information Helgoth had, you made a report of it and submitted it to the Merrick County Attorney, is that right?

A I think so.

We do not know what, if anything, an investigation by Kula into this anonymous phone call would have revealed. However, that is precisely the point. The State was aware that its case was based entirely on circumstantial evidence and that two other persons had already been arrested and charged for the murder. Under these circumstances, "'[a] cat and mouse game whereby the [State] is permitted to withhold important information requested by the accused cannot be countenanced. . . .'" *State v. Brown*, 214 Neb. 665, 674, 335 N.W.2d 542, 547 (1983).

The prosecution's failure to turn over the Helgoth information that it received from the sheriff's department violated the

district court's discovery order and constituted prosecutorial misconduct. Accordingly, the district court abused its discretion in overruling Kula's motion for new trial.

## V. CONCLUSION

Because of the State's repeated prejudicial discovery violations, we conclude that the district court erred in failing to grant Kula's motion for a continuance prior to opening statements and his motion for new trial following the verdict. Accordingly, we reverse, and remand for a new trial, without discussing Kula's other assigned errors.

REVERSED AND REMANDED FOR A NEW TRIAL.