Here, David's motion was without merit because the district court lacked jurisdiction. But, the fact that the district court granted David's motion indicates that such a legal position should not be deemed frivolous. We conclude that the motion was not brought in bad faith. We decline to award attorney fees on appeal to the beneficiaries on the ground that the motion was frivolous.

## CONCLUSION

For the reasons discussed, we vacate the district court's order granting David costs, expenses, and attorney fees and deny the beneficiaries' request for attorney fees pursuant to § 25-824.

VACATED AND DISMISSED.

HEAVICAN, C.J., and CASSEL, J., not participating.

––––––––––––

STATE OF NEBRASKA, APPELLEE, V.
VENCIL LEO ASH III, APPELLANT.
___ N.W.2d ___

Filed October 18, 2013.    No. S-12-753.

1. **Criminal Law: Motions for Continuance: Appeal and Error.** A decision whether to grant a continuance in a criminal case is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.

3. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

4. **Rules of Evidence: Other Acts: Appeal and Error.** It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 403 and 404(2), Neb. Rev. Stat. §§ 27-403 (Reissue 2008) and 27-404(2) (Cum. Supp. 2012), and the trial court's decision will not be reversed absent an abuse of discretion.

5. **Constitutional Law: Criminal Law: Pretrial Procedure: Evidence.** A criminal defendant has constitutional and statutory rights which mandate the timely disclosure of the State's evidence in a criminal case.

6. **Pretrial Procedure: Evidence.** Neb. Rev. Stat. § 29-1912(2) (Cum. Supp. 2012) requires the State, upon request, to disclose evidence that is material to the preparation of a defense.

7. **Double Jeopardy: Evidence: New Trial: Appeal and Error.** The Double Jeopardy Clause does not forbid a retrial so long as the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict.

8. **Rules of Evidence: Other Acts.** Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2012), does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime. This rule includes evidence that forms part of the factual setting of the crime, or evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime.

Appeal from the District Court for Kimball County: Derek C. Weimer, Judge. Reversed and remanded for a new trial.

James R. Mowbray and Kelly S. Breen, of Nebraska Commission on Public Advocacy, for appellant.

Jon Bruning, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Wright, Connolly, Stephan, McCormack, Miller-Lerman, and Cassel, JJ.

Per Curiam.

## INTRODUCTION

Vencil Leo Ash III was charged with first degree murder in the death of Ryan Guitron. Ash was found guilty following a jury trial and was sentenced to life imprisonment. We reverse Ash's conviction and sentence and remand the cause for a new trial.

## FACTUAL BACKGROUND

On November 4, 2003, Guitron was reported missing by his girlfriend. Guitron's remains were discovered nearly 7 years later, on April 8, 2010, on an abandoned farm in rural Kimball County, Nebraska. The cause of death was determined to be two gunshot wounds, one through the right eye and the other through the back of the neck. The shots were later determined

to be fired from a Hi-Point .380-caliber pistol purchased by Ash's sister. Guitron's death was later found to have occurred on October 15, 2003.

In August 2003, Guitron had been living in a trailer home in Fort Collins, Colorado, with Ash and Kelly Meehan-Ash, Ash's then 15-year-old girlfriend (now his wife). Guitron, Ash, and Meehan-Ash were methamphetamine users. After living with Guitron for 3 to 4 weeks during August 2003, Ash and Meehan-Ash moved to a tent near Grover, in Weld County, Colorado. Ash testified that at this time, he retrieved the .380-caliber pistol from his sister because Meehan-Ash wanted some form of protection. The pistol was originally purchased on August 1, 2003, in Walsenburg, Colorado. Ash was with his sister during the purchase of this handgun.

### MEEHAN-ASH'S VERSION OF EVENTS

At the time of trial, Ash and Meehan-Ash described two different versions of the events surrounding Guitron's death, each implicating the other as responsible for his murder. Meehan-Ash testified that Guitron had stolen a pair of her underwear and a bra and kept them with a pornographic magazine in a backpack and that after Ash found these items in Guitron's closet, he threatened to kill Guitron because of it. According to Meehan-Ash, on the day of the murder, Ash asked Guitron to travel with Ash and Meehan-Ash to get methamphetamine. Ash drove them in Guitron's car to the abandoned farm where Guitron's body was later discovered. The three of them had smoked methamphetamine during the car ride and again upon arriving at the abandoned farm.

According to Meehan-Ash, once parked, all three got out of the car and walked around the farm. They came upon parts of a baby bed, and Ash asked Meehan-Ash to collect the parts and take them back to the car. On her way back to the car, Meehan-Ash testified, she heard a gunshot. She turned in the direction of the two men and saw Ash standing over Guitron's body, holding the .380-caliber pistol. Meehan-Ash testified this was the first time she had seen the pistol that day because Ash normally tucked the gun in his pants. Meehan-Ash stated she did not hear or see a struggle or see any other weapon during the

incident. Ash then walked to the car to get some black gloves and told Meehan-Ash he was going to bury Guitron under a woodpile near the farm. After Ash covered up the body, they left to get gas and drove back to Fort Collins.

### Ash's Version of Events

Ash denied Meehan-Ash's story that Ash was aware Guitron had stolen Meehan-Ash's underwear and bra and that Ash wanted revenge. Ash testified that he and Guitron were actually good friends. Ash testified that on the day of the murder, the three of them went in Guitron's car to get iodine, an ingredient to make methamphetamine, from Guitron's iodine source so that Ash could "cook" more methamphetamine. Ash stated that he missed a turn and that they ended up at the abandoned farm where some old cars caught his eye. Ash also stated that he left his sister's .380-caliber pistol in a cooler that he put in the back seat next to Meehan-Ash. Ash testified, as did Meehan-Ash, that the three of them had smoked methamphetamine during the drive. He also agreed that they found a baby bed while at the farm. Ash testified that after finding the baby bed, Guitron went to the car and got a .22-caliber rifle and then Ash and Guitron continued to search the property without Meehan-Ash.

Ash testified that during their search, Guitron was going to smoke more methamphetamine, but discovered that there was no more methamphetamine left to smoke. Guitron then claimed that "he was going to kill that fucking bitch," referring to Meehan-Ash, and "took off running," rifle in hand. Ash went after Guitron, and he saw Guitron fire a shot from the .22-caliber rifle at Meehan-Ash. Ash then knocked the rifle out of Guitron's hand, which caused another round to go off. The two men struggled, and then Ash saw Meehan-Ash and heard a shot. The men fell to the ground, and Ash heard another shot. He then saw Guitron lying on the ground and Meehan-Ash in the car, banging her head against the dashboard. Ash testified, as did Meehan-Ash, that they then went to get gas. Ash testified that they returned, however, to pick up the rifle and retrieve from Guitron's person the address of Guitron's iodine source.

After the murder, Ash traded Guitron's car for a Cadillac Escalade. Meehan-Ash was with him during the trade. After trading for the Escalade, Ash and Meehan-Ash returned to Guitron's trailer home in Fort Collins and loaded Guitron's property into the Escalade. On October 13, 2003, 2 days before the murder, Ash had pawned Guitron's "Raiders Pro Line" leather jacket. Meehan-Ash claimed they had pawned the jacket to get money for food. Ash testified that he probably had pawned the jacket if his name was on the pawn ticket, but that he did not remember doing so. On October 17, 2 days after the murder, Ash pawned Guitron's television.

On October 18, 2003, Ash was arrested on a warrant for parole violations. The Escalade remained with Meehan-Ash after Ash's arrest. Meehan-Ash was arrested the next day on a juvenile warrant, and the .380-caliber pistol was discovered under Meehan-Ash's bed at Ash's sister's house where Meehan-Ash was living. The Escalade was towed on October 19. Several of Guitron's possessions were removed from the Escalade, including his credit card and various personal items identified at trial as belonging to Guitron. The parts of the baby bed gathered on the day of the murder were also removed from the Escalade. Law enforcement retrieved the .380-caliber pistol from Ash's sister on November 24. It was not disputed that this was the weapon used to shoot Guitron.

After Guitron's disappearance, Ash was questioned by law enforcement on several occasions. On November 4, 2003, Ash indicated that he had last seen Guitron on October 17 and that Guitron was supposed to pick him up to go work at an oil rig the next day, but Guitron never showed up. And on March 18, 2004, Ash was interviewed by the lead investigator into Guitron's disappearance. At that time, Ash told the investigator that he was broke at the time of his arrest because he had given Guitron large sums of money. Ash claimed that Guitron was still alive and that he last saw him on October 18, 2003, at Guitron's trailer home. Ash denied killing Guitron, but at the end of the interview, unsolicited, he asked whether they had found Guitron's body. Ash then stated that if Guitron was dead, law enforcement would have found his body because it had been quite some time since Guitron's disappearance.

On April 2, 2010, Meehan-Ash was interviewed by law enforcement on a different matter; however, she volunteered at the interview that Ash had killed Guitron. Meehan-Ash was then escorted by the lead investigator to try to locate the abandoned farm, but she failed to do so.

Following this interview, the lead investigator again interviewed Ash on April 7, 2010. At this interview, Ash initially denied shooting Guitron, but then admitted to shooting Guitron twice to protect Meehan-Ash because Guitron was shooting at her. Ash then directed law enforcement to the abandoned farm. Guitron's remains were later discovered there.

Officers also located two .22-caliber rifle casings at the abandoned farm. One casing was lying on top of the dirt, and the other on top of some cement; neither casing was rusted. Based on the locations of the two casings, law enforcement determined that the casings could not have been ejected to their respective locations from where Guitron had been shot, as shown by physical evidence that still remained at the scene, or from where his remains were located.

Later at trial, Ash testified that in order to protect Meehan-Ash, he initially did not tell law enforcement that Meehan-Ash shot Guitron. Ash further testified that Ash had promised Meehan-Ash's father that he, Ash, would take the blame for Guitron's murder. But according to Ash, while he was in jail, a puppy in his care died and that event made Ash want to tell the truth to law enforcement about who killed Guitron.

On November 1, 2011, the State filed an information charging Ash with the first degree murder of Guitron. Meehan-Ash was the first endorsed witness listed on the information. In a separate information, Meehan-Ash was charged with aiding and abetting the first degree murder of Guitron. The cases were consolidated for trial, and the trial was scheduled to begin June 25, 2012.

On June 15, 2012, Meehan-Ash agreed to submit to an off-the-record proffer with the State. Meehan-Ash later agreed to testify at trial consistent with that proffer. In exchange, the State agreed to reduce Meehan-Ash's charge of aiding and abetting the first degree murder of Guitron to accessory after

the fact. The State, Meehan-Ash, and Meehan-Ash's attorney signed this agreement. The discussion took place on June 20. On June 22, 3 days before trial was scheduled to begin, the State notified Ash's counsel that Meehan-Ash had struck a deal with the State, provided the State with an additional statement, and would now be testifying at trial.

On June 22, 2012, a telephone hearing was held at which Ash made an oral motion to continue trial. No bill of exceptions exists for this hearing, but the parties agree that the district court denied the motion. At oral argument before this court, counsel for Ash indicated that the district court judge stated during the telephonic conference that he would not be granting the motion at that time because it would be an obstacle to the court to inform the persons already summoned for jury service.

On June 25, 2012, prior to the commencement of trial, Ash filed a written motion, again requesting a continuance of the trial date, because counsel needed to complete additional pretrial discovery in light of Meehan-Ash's June 22 plea agreement. Defense counsel argued that his preparation, trial strategy, and theory had to be adjusted for a surprise witness. Counsel further argued that as there were hundreds of pages of correspondence between Ash and Meehan-Ash, more than 10 hours of recorded conversations, and several interviews of Meehan-Ash conducted by law enforcement, it would be "impracticable and unduly onerous" to undertake re-review for possible impeachment 3 days prior to trial. The State did not file a written response.

On June 25, 2012, when the parties appeared for the first day of trial, defense counsel orally renewed the motion to continue. The court initially denied the motion, but ordered that Meehan-Ash be produced for a deposition that evening. The jury was selected for trial that day, a Monday, but the actual trial did not commence. Arrangements were then made for Ash's counsel to take Meehan-Ash's deposition Monday evening before opening statements, and the presentation of the evidence began on Tuesday.

After Meehan-Ash's deposition was taken, defense counsel renewed his motion to continue. Defense counsel stated that

during her deposition, Meehan-Ash had reported for the first time that she was using methamphetamine before arriving at the farm and while she was there. In addition, she reported for the first time that during the period when the murder occurred, she had experienced visual and tactile hallucinations caused by her continual use of methamphetamine. Counsel stated that Meehan-Ash's statements were strong evidence that she was suffering from a drug-induced psychosis and that counsel needed time to find an expert who could explain the significance of her statements and drug use: i.e., that a person in a drug-induced psychosis can commit violent acts without knowing it.

The State was present at Meehan-Ash's deposition and responded to defense counsel's renewed motion on the record. The State argued that there had been no representation whatsoever that on the day of the murder, Meehan-Ash was experiencing hallucinations or that her memory about the murder was affected by methamphetamine. The State further argued that defense counsel had been aware through the pretrial preparation that Meehan-Ash was using methamphetamine. It argued that Meehan-Ash's use of methamphetamine on the day of the murder was not a surprise to Ash's counsel, because Ash, in his own statement, had told investigators that one reason for the crime was the use of methamphetamine by Guitron, Ash, and Meehan-Ash. Ash's renewed motion to continue was denied.

The motion was again renewed after the State's direct examination of Meehan-Ash. Defense counsel renewed his past arguments on the matter and further argued that he needed time to take the deposition of Aquilla Rios, an out-of-state witness, for impeachment purposes. The State did not respond to the motion, and it was denied. The record shows that on cross-examination, Meehan-Ash stated that in 2009, she told Rios about the murder, which was the first time she had told anyone about it. She told Rios that Guitron had repeatedly molested and raped her while she was living in his trailer home, but she stated that she could not remember whether she had told Rios about Ash's finding her underwear and bra in Guitron's backpack.

Also at the time of trial, Ash's counsel objected to the State's offer and the district court's admittance of a receipt signed by Ash showing that 2 days before the murder, Ash pawned a leather jacket belonging to Guitron. Ash's counsel argued the admission of this evidence violated Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2012), and moreover, there had been no hearing on the admissibility of this evidence. The State argued that this evidence was relevant as to intent and premeditation and that the alleged "bad act" of pawning Guitron's jacket was so intertwined with the underlying murder that under Nebraska's evidence laws, the receipt was admissible. The motion was ultimately denied.

Ash was convicted. He appeals.

## ASSIGNMENTS OF ERROR

Ash assigns that the district court erred in (1) denying his motion to continue trial and (2) admitting into evidence the pawn receipt for an improper purpose and without a prior hearing on admissibility.

## STANDARD OF REVIEW

[1,2] A decision whether to grant a continuance in a criminal case is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.[1] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.[2]

[3,4] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[3] It is within the discretion of the trial court to determine relevancy and admissibility of evidence of other wrongs or acts under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403

---

[1] *State v. Davlin*, 272 Neb. 139, 719 N.W.2d 243 (2006).

[2] *Id*.

[3] *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012).

(Reissue 2008), and § 27-404(2), and the trial court's decision will not be reversed absent an abuse of discretion.[4]

## ANALYSIS

### Motion to Continue Trial

Ash first assigns that the district court abused its discretion by denying his motion to continue trial based upon Meehan-Ash's plea agreement to testify, because her deal was struck upon the eve of trial.

The basis of Ash's argument on appeal is that his counsel should not have to conduct a "night-time"[5] investigation to prepare for Meehan-Ash's testimony. In arguing to the district court on the motion to continue, Ash contended that he needed additional time to investigate Meehan-Ash's allegations that she experienced hallucinations while using methamphetamine, as she had been doing the day of the murder. Ash also contended that he needed additional time to interview a new witness, a former coworker of Meehan-Ash, because that coworker might have information regarding Meehan-Ash's allegations that she was coerced by Ash. We agree.

[5,6] A criminal defendant has constitutional and statutory rights which mandate the timely disclosure of the State's evidence in a criminal case. *Brady v. Maryland*[6] and *Kyles v. Whitley*[7] impose the constitutional mandate to disclose exculpatory evidence. Neb. Rev. Stat. § 29-1912(2) (Cum. Supp. 2012) further requires the State, upon request, to disclose evidence that is material to the preparation of a defense:

> [W]hether a prosecutor's failure to disclose evidence results in prejudice depends on whether the information sought is material to the preparation of the defense, meaning that there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses,

---

[4] *Id.*

[5] Brief for appellant at 10.

[6] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

[7] *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995).

corroborating testimony, or assisting impeachment or rebuttal.[8]

In *State v. Kula*,[9] the State failed to turn over certain reports generated during the course of the police investigation until the first day of trial. We found the reports to be material and held that the trial court abused its discretion in failing to grant a continuance until the defendant could adequately investigate the reports and prepare a defense:

> Because the State did not produce the material reports until the first day of trial, [the defendant] was unable to outline certain witnesses' testimony in his opening statements. Furthermore, [the defendant's] counsel should not have been forced into investigating the content of the reports by night while defending against a murder charge by day. In effect, [the defendant's] counsel was put in the position of trying this case on the run.[10]

We find *Kula* instructive. It is true that the State endorsed Meehan-Ash as a witness and that Ash knew Meehan-Ash used methamphetamine. But until she reached a plea agreement with the State, she would not have testified to facts that implicated her in first degree murder. She specifically admitted during cross-examination that she would not have testified against Ash if the State had not made a plea agreement with her that removed the possibility of a sentence of life imprisonment without parole. Thus, investigating Meehan-Ash's credibility was not a defense issue until she reached an agreement to testify in exchange for a reduced charge.

Moreover, in overruling Ash's motion for a continuance, the court did not find that his attorney's description of Meehan-Ash's statements in her deposition was inaccurate or false. The new information about Meehan-Ash's hallucinations was obviously material to preparing a defense because it directly

---

[8] *State v. Kula*, 252 Neb. 471, 486, 562 N.W.2d 717, 727 (1997). Accord, *State v. Van*, 268 Neb. 814, 688 N.W.2d 600 (2004); *State v. Castor*, 257 Neb. 572, 599 N.W.2d 201 (1999).

[9] *State v. Kula, supra* note 8.

[10] *Id.* at 487, 562 N.W.2d at 727.

affected her credibility. Similarly, investigating Meehan-Ash's statements to Rios might have undermined Meehan-Ash's credibility about Ash's motive for the murder—finding her underwear and bra in Guitron's backpack. Finally, investigating Meehan-Ash's statements to a coworker might have impeached her statements at trial that she feared Ash and that he had coerced her silence. And while defense counsel could have taken steps to find an expert or investigate impeachment information earlier, the need to take these steps did not arise until the State reached a plea agreement for her testimony literally on the eve of trial.

Although defense counsel cross-examined Meehan-Ash on her relationship with Ash and her claim that he had coerced her, without an opportunity to investigate, Ash could not discover whether she had made inconsistent statements to a third party that would have impeached her testimony. The fact that Ash's trial counsel took reasonable steps under the circumstances to address Meehan-Ash's testimony at trial does not remedy the prejudice of not having an opportunity to conduct an investigation.

Of course, not every "late" notice of an otherwise endorsed witness will require the granting of a continuance. But the State's endorsement of a codefendant as a witness is not fair notice that the codefendant will actually testify when the defendant's counsel reasonably believes that the codefendant will invoke his or her privilege against self-incrimination. We therefore hold that when the State reaches a plea agreement with a codefendant to testify on the brink of trial and that testimony is central to the State's prosecution of a criminal defendant, a trial court must, upon request, provide defense counsel with an adequate opportunity to investigate facts relevant to defending against the testimony. The failure to provide a continuance under such circumstances is prejudicial. We therefore conclude that the district court erred in denying Ash's motion for continuance.

[7] Having concluded that the denial of the motion to continue was reversible error, we must determine whether the totality of the evidence admitted by the district court was sufficient to sustain Ash's conviction; if it was not, then

double jeopardy forbids a remand for a new trial.[11] But the Double Jeopardy Clause does not forbid a retrial so long as the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict.[12]

After reviewing the record, we conclude that the evidence presented at trial was sufficient to support the verdict against Ash. As such, we conclude that double jeopardy does not preclude a remand for a new trial, and we therefore reverse, and remand for a new trial.

## Prior Bad Acts Evidence

Ash next assigns that the district court erred in admitting the pawn receipt showing that Ash pawned Guitron's jacket 2 days before Guitron's murder. Though we reverse, and remand as a result of the district court's failure to grant Ash's requested continuance, we address this assignment of error as it is likely to recur on retrial.[13]

On appeal, Ash contends that the pawn receipt was inadmissible as evidence of other bad acts, namely theft, under § 27-404(2). Ash further asserts that the State failed to show that the evidence was admissible for a proper purpose under § 27-404(2). And Ash argues that no hearing on the admissibility of this bad acts evidence was held as required by § 27-404(3).

Section 27-404 provides in relevant part:

(2) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

---

[11] See *State v. Sorensen*, 283 Neb. 932, 814 N.W.2d 371 (2012).

[12] *Id*.

[13] See, e.g., *State v. Beeder*, 270 Neb. 799, 707 N.W.2d 790 (2006), *disapproved on other grounds, State v. McCulloch*, 274 Neb. 636, 742 N.W.2d 727 (2007).

(3) When such evidence is admissible pursuant to this section, in criminal cases evidence of other crimes, wrongs, or acts of the accused may be offered in evidence by the prosecution if the prosecution proves to the court by clear and convincing evidence that the accused committed the crime, wrong, or act. Such proof shall first be made outside the presence of any jury.

Ash objected to the admission of the pawn receipt at trial on the basis of § 27-404(2). The district court overruled Ash's objection, finding that the evidence was inextricably intertwined with the crime charged because it formed the factual setting for the crime and, as such, did not fall under § 27-404(2).

[8] Indeed, Nebraska law provides that § 27-404(2) does not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime:

This rule includes evidence that forms part of the factual setting of the crime, or evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime.[14]

But we disagree that evidence of Ash's theft 2 days before the murder was inextricably intertwined with the charged crime.

As our inextricably intertwined rule implies, courts may generally admit evidence of a criminal defendant's uncharged bad act under this exception because exclusion would render the evidence of the charged crime confusing or incomplete.[15] It

---

[14] *State v. Freemont, supra* note 3, 284 Neb. at 192, 817 N.W.2d at 290-91. Accord, *State v. Almasaudi*, 282 Neb. 162, 802 N.W.2d 110 (2011); *State v. Baker*, 280 Neb. 752, 789 N.W.2d 702 (2010); *State v. Wisinski*, 268 Neb. 778, 688 N.W.2d 586 (2004). Cf. *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006).

[15] See 2 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 404.20[2][b] (Joseph M. McLaughlin ed., 2d ed. 2011) (citing federal cases).

is the close entanglement of the evidence that creates the need to present evidence of facts that are inconsequential to proving the charged crime. In addition, federal courts hold that a defendant's other bad act is inextricably intertwined with the charged offense "when both acts are part of a single criminal episode, or when the other acts were necessary preliminaries to the crime charged."[16]

Most of our case law is consistent with these rules. It shows that we have upheld the admission of intrinsic evidence in the following circumstances: (1) The defendant's other bad acts showed his pattern of sexually abusing a child or exposing the child to sexually explicit material[17]; (2) the defendant destroyed evidence of the crime soon afterward[18]; (3) the defendant's arrest for a different theft resulted in the discovery of evidence of the charged theft, and the evidence established that the items were stolen[19]; and (4) the defendant was using a controlled substance at the time that the crime was committed.[20]

But none of these fact patterns are similar to this case. The theft of Guitron's jacket was not part of the factual setting for the murder, nor did it occur in the same immediate timeframe. So, it was not intrinsic because of its entanglement with the charged murder. Alternatively, it was not part of the same transaction as the murder, it was not a preliminary step in the murder, and it was not a consequential fact to establish the murder.

Instead, to the extent that the theft was admissible for a purpose other than to show Ash's bad character, it was relevant to show his motive: He committed the murder because he needed money. But the State's theory of Ash's motive was revenge. And even if we accepted Ash's need for money as a secondary motive—an issue that we do not decide—the State neither

---

[16] *Id*. at 404-44.

[17] See, *State v. Baker, supra* note 14; *State v. McPherson*, 266 Neb. 734, 668 N.W.2d 504 (2003).

[18] See *State v. Robinson, supra* note 14.

[19] *State v. Wisinski, supra* note 14.

[20] See, *State v. Aguilar*, 264 Neb. 899, 652 N.W.2d 894 (2002); *State v. Pruett*, 263 Neb. 99, 638 N.W.2d 809 (2002).

informed the court that it was offering the evidence to show Ash's motive nor proved its allegations in a hearing outside of the jury's presence. This case illustrates that applying the inextricably intertwined exception too broadly would eviscerate the procedural protections that apply to evidence presented under § 27-404(2).[21] We conclude that the court abused its discretion in admitting evidence of the theft under the inextricably intertwined exception.

## CONCLUSION

The judgment and sentence of the district court are reversed, and the cause is remanded for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.

---

[21] See *State v. Freemont, supra* note 3.

HEAVICAN, C.J., concurring in part, and in part dissenting.

I concur with the majority's determination that the district court erred when it failed to grant Ash's motion to continue. I write separately because I disagree with the majority's determination that the admission of the pawn receipt violated Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Cum. Supp. 2012).

This court has often excluded certain evidence from the limitations set forth by rule 404(2)[1]:

> """"[W]here evidence of other crimes is "so blended or connected, with the one[s] on trial [so] that proof of one incidentally involves the other[s]; or explains the circumstances; or tends logically to prove any element of the crime charged," it is admissible as an integral part of the immediate context of the crime charged. When the other crimes evidence is so integrated, it is not extrinsic and therefore not governed by Rule 404 . . . . As such, prior conduct that forms the factual setting of the crime is not rendered inadmissible by rule 404. . . . The State

---

[1] *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006); *State v. Wisinski*, 268 Neb. 778, 688 N.W.2d 586 (2004); *State v. Aguilar*, 264 Neb. 899, 652 N.W.2d 894 (2002).

is entitled to present a coherent picture of the facts of the crime charged, and evidence of prior conduct that forms an integral part of the crime charged is not rendered inadmissible under rule 404 merely because the acts are criminal in their own right, but have not been charged. . . . A court does not err in finding rule 404 inapplicable and in accepting prior conduct evidence where the prior conduct evidence is so closely intertwined with the charged crime that the evidence completes the story or provides a total picture of the charged crime. . . .'""'"[2]

More recently, in *State v. Freemont*,[3] this court began moving away from this exception in favor of a broader application of rule 404(2). In *Freemont*, a decision in which I did not participate, the defendant was charged with second degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. This court concluded that the testimony stating that several days before the murder at issue, the defendant, who was a felon, had been in the possession of a firearm was inadmissible under rule 404(2). The majority concluded that this evidence was not excepted from the rule under the "inextricably intertwined" exception, holding that "the prior misconduct did not provide any insight into [the defendant's] reason for killing" the victim and "was not part of the same transaction and occurred several days or a week before" the murder.[4] This court also expressed concern that holding otherwise would "open the door to abuse" of the exception, noting that several federal courts have limited or rejected the exception.[5]

In a concurring opinion, Judge Cassel disagreed with the majority's conclusion that the testimony in question was not substantive evidence of the charged crimes, noting the fact that the defendant had a gun shortly before the date of the underlying charges was "powerful circumstantial evidence that

---

[2] *State v. Robinson, supra* note 1, 271 Neb. at 714, 715 N.W.2d at 549.

[3] *State v. Freemont*, 284 Neb. 179, 817 N.W.2d 277 (2012).

[4] *Id*. at 192, 817 N.W.2d at 291.

[5] *Id*.

he or she possessed it on the day of the charge. This evidence does not speak to the defendant's character; rather, it is evidence tending to prove that he or she possessed the gun on the date charged."[6]

The concurrence further notes that "the majority's approach would require a rule 404 analysis simply because the observations were not on the precise day of the charged crime."[7] The concurrence continues:

> In the case before us, the evidence is not so removed in time as to lose its temporal connection to the charged date of possession. While I concede that such an interval exists, it is clear to me that a matter of a few days or a week is well within the relevant time.[8]

I am persuaded by the arguments set forth by the concurrence in *Freemont*, and I would not have joined the majority's opinion in that case. I find the arguments set forth by Judge Cassel in his concurrence to be applicable to the circumstances of this case. In my view, there is still a place for the inextricably intertwined exception.

I would find the evidence of the pawn receipt inextricably intertwined with the crime charged. Under our case law, where evidence of other crimes is "'"'"'so blended or connected with the one[s] on trial . . .' . . . ,"'"'"'" that evidence "'"'"'tends logically to prove any element of the crime charged.' . . ."'"'"'"[9] In this case, that is just what the pawn receipt did.

The State's theory of the case was that Ash's motive was both to exact revenge for the sexual assault of Meehan-Ash and to rob Guitron. Evidence presented at trial showed that Ash and Meehan-Ash were in need of cash. Ash pawned Guitron's jacket, which was one of Guitron's prized possessions, just 2 days before the murder. The day after the murder, Ash exchanged Guitron's car for an Escalade and then retrieved his

---

[6] *Id*. at 212, 817 N.W.2d at 303 (Cassel, Judge, concurring).

[7] *Id*.

[8] *Id*.

[9] *State v. Robinson, supra* note 1, 271 Neb. at 714, 715 N.W.2d at 549.

and Meehan-Ash's possessions from Guitron's trailer. At that time, Ash helped himself to more of Guitron's possessions, pawning Guitron's television and apparently keeping the rest. When considered with this other evidence showing that Ash robbed Guitron, the pawn receipt tends to show Ash's intent and premeditation to commit first degree murder, an element necessary to the State's charge of first degree murder.

In addition to tending logically to prove any element of the crime charged,[10] so-called intrinsic or inextricably inter-twined evidence is admissible despite rule 404(2) where it forms the factual setting of the crime.[11] And all the evidence does just that: forms the factual setting of the crime and pre-sents to the jury the relevant and material actions of Ash and Meehan-Ash immediately before, during, and after the murder. This evidence showed that a few days before, the day of, and immediately after the murder, Ash and Meehan-Ash took items belonging to Guitron for material and financial gain. Such evidence was necessary for the State to present a coherent picture of the charged crime of premeditated murder. And because the pawning of the jacket occurred just days before the murder, in my view, the incident had not yet lost any temporal connection to Guitron's murder.

In its opinion, the majority notes this evidence would likely be admissible as independently relevant under rule 404(2) following a hearing under rule 404(3), and indeed provides a framework to the State and trial court to achieve just that end. But this framework is unnecessary because, in my view, rule 404(2) does not apply to prohibit the admission of this evidence.

For these reasons, I respectfully dissent from the majority's determination that the admission of the pawn receipt violated rule 404(2).

Cassel, J., joins in this concurrence and dissent.

---

[10] Id.

[11] Id.