Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/13/2019 08:06 AM CDT

State of Nebraska, appellee, v.
Michael T. Schramm, appellant.

___ N.W.2d ___

Filed July 30, 2019.    No. A-18-738.

1. **Criminal Law: Motions for Continuance: Appeal and Error.** A decision whether to grant a continuance in a criminal case is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition.

3. **Motions for Continuance: Appeal and Error.** The failure to comply with the provisions of Neb. Rev. Stat. § 25-1148 (Reissue 2016) is but a factor to be considered in determining whether a trial court abused its discretion in denying a continuance.

4. **Motions for Continuance.** A continuance must be granted to allow defense counsel adequate time to prepare a defense.

5. **Constitutional Law: Criminal Law: Pretrial Procedure: Evidence.** A criminal defendant has constitutional and statutory rights which mandate the timely disclosure of the State's evidence in a criminal case.

6. **Pretrial Procedure: Evidence.** Neb. Rev. Stat. § 29-1912(2) (Reissue 2016) requires the State, upon request, to disclose evidence that is material to the preparation of a defense.

7. **Motions for Continuance: Appeal and Error.** There is no abuse of discretion by a court in denying a continuance unless it clearly appears that the defendant suffered prejudice as a result thereof.

8. **Double Jeopardy: Evidence: New Trial: Appeal and Error.** The Double Jeopardy Clause does not forbid a retrial so long as the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict.

9. **Expert Witnesses: Appeal and Error.** The standard for reviewing the admissibility of expert testimony is abuse of discretion.

10. **Trial: Expert Witnesses.** Under the principles set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion.

11. **Pretrial Procedure: Expert Witnesses.** A challenge to the admissibility of evidence under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), should take the form of a concise pretrial motion. It should identify, in terms of the *Daubert/Schafersman* factors, what is believed to be lacking with respect to the validity and reliability of the evidence and any challenge to the relevance of the evidence to the issues of the case.

12. **Jury Instructions: Judgments: Appeal and Error.** Whether jury instructions given by a trial court are correct is a question of law. When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below.

13. **Jury Instructions: Appeal and Error.** In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.

14. ____: ____. All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.

15. **Jury Instructions: Proof: Appeal and Error.** To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

16. **Jury Instructions.** Whenever an applicable instruction may be taken from the Nebraska Jury Instructions, that instruction is the one which should usually be given to the jury in a criminal case.

Appeal from the District Court for Lancaster County: Darla S. Ideus, Judge. Reversed and remanded for a new trial.

Matthew K. Kosmicki for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

Riedmann, Arterburn, and Welch, Judges.

Arterburn, Judge.

## I. INTRODUCTION

Pursuant to a jury verdict, Michael T. Schramm was convicted in the district court for Lancaster County of strangulation and sentenced to 2 years' imprisonment followed by 12 months' postrelease supervision. Schramm appeals from his conviction and sentence. On appeal, he alleges that the district court erred in denying his motion to continue the trial so that he could obtain his own expert witness, in permitting the State's expert witness to testify over his objections, in instructing the jury, and in imposing an excessive sentence. For the reasons set forth herein, we find that the district court abused its discretion in denying Schramm's motion to continue the trial. Schramm should have been provided with additional time to attempt to find his own expert witness. As a result of our finding, we must reverse Schramm's conviction and remand the cause for a new trial.

## II. BACKGROUND

On November 1, 2017, the State filed an information charging Schramm with strangulation, in violation of Neb. Rev. Stat. § 28-310.01 (Reissue 2016), a Class IIIA felony. The charge against Schramm stemmed from an incident between Schramm and his then girlfriend, J.K., which occurred in the early morning hours of August 28, 2017.

J.K. is a citizen of the Czech Republic. Beginning in 2014, she began spending time in Lincoln, Nebraska, after obtaining a student visa. She completed a semester of classes at the University of Nebraska-Lincoln and had an internship. When her student visa expired, she went home to the Czech Republic, but later obtained a tourist visa and returned to Lincoln. While J.K. was in Lincoln, she met Schramm through mutual friends.

The two began a romantic relationship in February or March 2016. Schramm testified that "immediately we fell in love and she moved in with me." During their relationship, J.K. went back and forth between Lincoln and the Czech Republic. When she was in the Czech Republic, Schramm would come to visit her there.

By August 2017, J.K. was back in Lincoln and was living with Schramm at his home. J.K. was not employed, but Schramm had his own business buying and selling video games online. On the afternoon of August 27, 2018, Schramm surprised J.K. by taking her on a day trip to Omaha, Nebraska, to visit a zoo. On their way to Omaha, they stopped at a shopping center where Schramm bought J.K. a new purse. They then traveled the rest of the way to the zoo where they stayed until it closed. After leaving the zoo, J.K. and Schramm went to a bar in Omaha where they each had at least one alcoholic beverage. J.K. then drove them back to Lincoln. Schramm testified that on the drive back to Lincoln, they were "[m]adly in love." They arrived home around 10 or 11 p.m., consumed more alcohol, and then decided to go to a local bar. At the bar, both J.K. and Schramm continued to drink alcohol. They left the bar at 2 a.m. and returned to Schramm's house.

When they returned to Schramm's house, J.K. and Schramm engaged in a verbal argument regarding Schramm's business and his ability to earn an income. J.K. testified at trial that during the verbal argument, Schramm indicated that he wanted to buy a new house and that he believed he could quickly obtain enough money to do so by selling all of his video game inventory. She indicated that he also began to insult and disparage her regarding her financial situation, including making comments that she did not have a job and that she still received financial support from her parents. Schramm then went upstairs to play video games. J.K. explained that she was upset with Schramm and did not like his exaggerations about the success of his business. So, out of anger, she yelled up the stairs to Schramm, telling him that he did not earn

enough money to be able to buy a new house and that she did not believe what he had said about his ability to earn so much money so quickly. J.K. admitted that she knew these comments would make Schramm mad.

J.K. indicated that Schramm, in fact, became very upset by her comments. She heard him yell that "this is enough, I am going to kill you." She then heard him start to run toward the stairs, so she started to run downstairs to the basement to hide from him. When she got to the landing of the basement steps, she became worried that Schramm would laugh at her for being scared, so she pretended to get food for their dogs on a shelf above the landing. While her back was turned, J.K. heard Schramm open the basement door. She felt him push her in the back, and she fell the rest of the way down the basement stairs, landing against a mattress that was propped up against the wall of the basement. She started to cry and attempted to stand up. Schramm ran down the stairs after her, grabbed her neck with his left hand, pulled her to a standing position, and pushed her head against the wall. Schramm told her, "this is enough" and "I am going to kill you this time." J.K. described Schramm as looking her straight in the face, with eyes that "were violent," while "[g]rinding" his teeth.

J.K. testified that while Schramm had his hand around her neck, she felt pressure. She tried to tell Schramm that he was hurting her, but she was unable to talk and unable to breathe. J.K. described that as the pressure around her neck continued, she started to panic and realized she needed to fight back. She testified that she was very scared and knew that she might die. She pulled Schramm's hair so that his head was very close to her face and bit his ear as hard as she could. J.K. was then able to get free from Schramm's grasp. She ran up the stairs and out the main door of the house, without stopping to grab her purse or her cellular telephone. She ran to a neighbor's house and banged on the door until someone answered. The neighbor called police. J.K. testified that she chose this neighbor to run to, even though she knew he had "issues" with

police, because her other neighbor was friends with Schramm and she believed he might not help her.

When police arrived, they spoke with J.K. about what had occurred. One of the first officers on the scene, Officer Jesse Orsi, contacted J.K. first. He described J.K. as crying and being unable to speak. She had her hands up by her neck, "doing a gesture as if she was choking herself," and was also pointing at Schramm's house. Eventually, J.K. spoke in a voice that Orsi described as not being "normal" and sounding "soft [and] broken." All she was able to say was, "my boyfriend." Orsi understood J.K. to be trying to explain that "her boyfriend choked her."

Officer Robert Hallowell spoke with J.K. next. He indicated that upon his arrival, J.K. was "frantic" and was crying. She had leaves in her hair and was speaking very fast. J.K. told Hallowell that she had been pushed down the stairs and strangled during a fight with her boyfriend. J.K. also told him that the fight was her fault, because she had made comments which she knew would upset Schramm. Hallowell observed various injuries on J.K., including "extremely blood-shot eyes," which, in his opinion, were caused by more than just her consumption of alcohol; some redness to both sides of her neck around the area of her clavicle bones; a small bump on the back of her head; and abrasions on her elbow and on her knee. His photographs of these injuries were offered into evidence by the State. J.K. declined any medical treatment for her injuries.

Hallowell also photographed the area in the basement where J.K. described the assault as occurring. These photographs depict a "steep" staircase with a mattress propped up at the bottom of the staircase. Close up pictures of the wall of the basement near the staircase appear to show long blond hairs to be stuck "within [the] rough texture on the [basement] wall." According to Hallowell, these hairs "were consistent with coming from [J.K.'s] head." The photographs also depict leaves

on the basement floor which appear to be consistent with the leaves seen in J.K.'s hair.

At trial, Schramm testified in his own defense and described a much different series of events after he and J.K. returned from the bar in the early morning hours of August 28, 2017. Schramm testified that he and J.K. actually began arguing in the car on the way home from the bar. He explained that he was upset with J.K. because she had been talking to "an old interest" while they were at the bar. He told her that he was not happy with her and was jealous because of her behavior. When they got home, Schramm explained that J.K. "got aggressive." He went on to testify, "She was bored with the house and she did not like or think my job was a real thing. And she brings it up. So she brought it up about that I need to stop doing something besides sitting in the house and selling video games all day." Schramm indicated that he did not engage in the argument with J.K. Instead, he asked her why she "always [was] so mean" to him. She responded by telling him, "[Y]ou have no idea how many times I have cheated on you." She then ran down the basement stairs, stopping on the second to the last step.

Schramm followed J.K. down the basement stairs, asking her to repeat what she had just told him. When she turned around to address him, she lost her footing and leaned back into the mattress at the bottom of the staircase. As he approached her, she hit him three times on the head with a closed fist, without saying anything to him. She then pulled his hair and pressed her fingers into his face. He pushed her away from him, placing his hands at her clavicle bones. As she moved away from him, she continued to hold on to his hair, and she pulled some hair out of his head. Schramm testified that he never squeezed J.K.'s throat and that J.K. did not bite his ear. She did run upstairs and outside, however. Schramm explained that he did not immediately follow her, because he was trying to give her some "space" so that she could calm down. Schramm watched as J.K. ran to a neighbor's house.

He testified they did not get along with that neighbor and were "terrified" of him.

Schramm offered into evidence a picture of himself, which he explained was taken close in time to J.K.'s assault of him. The pictures do not depict any obvious injury to his ear.

After Schramm was arrested and transported to jail, he called J.K.'s cellular telephone. A recording of this call was offered into evidence. During the conversation, Schramm told J.K. that he could call only one telephone number and that because he called her, he could not call anyone else. He repeatedly begged her to call his father and instructed her to write down his father's telephone number. J.K. refused. She told Schramm that he "almost killed [her]." Schramm did not deny this, but said that he is "going to be in jail for a very long time." He also told J.K. that "all [she] ha[d] to do [was] show up at court at 12:00." He instructed her to "say that I didn't," but then his voice trailed off.

During Schramm's trial testimony, he admitted that contrary to his statements to J.K. during the telephone call, he made calls to people other than J.K., including his mother, while he was in jail. In addition, Hallowell testified that in the "book-in area" at the jail, there are two telephones available for the prisoners' use. Prisoners are permitted to make as many telephone calls as they want to as many telephone numbers as they want, all free of charge. Schramm further explained that he called J.K. because he loved her and that he asked her to call his father because he could not remember his father's telephone number. Schramm was unable to explain how he could provide J.K. with his father's telephone number if he did not remember it.

During the trial, the State offered the testimony of Susan Michalski as an expert witness on domestic violence and strangulation. Schramm objected to Michalski's testimony on various grounds, which we will address more thoroughly in our analysis below, but the district court overruled all of Schramm's objections and permitted Michalski to testify.

At trial, Michalski testified regarding her extensive experience with domestic violence. Michalski is a licensed registered nurse who is self-employed in "training, education, nursing activities and consulting in criminal justice cases," including cases involving domestic assault, strangulation, custody, and sexual assault. For the 12 years prior to her starting her own business, Michalski served as the training and education director for a domestic violence coordinating council in Omaha. She has received specialized training related to conflict management, strangulation, and domestic violence. As an educator, Michalski has given training sessions and symposiums regarding domestic violence, and specifically strangulation. Michalski also testified that she provides training for law enforcement, members of the criminal justice system, medical students, hospital personnel, and members of the community in the Omaha and surrounding areas. Through her work, Michalski has had articles published twice and has come into contact with several thousand victims of domestic violence.

Michalski explained that domestic violence involves the power and control that one partner exerts over another in an intimate relationship. It can include "a variety of different tactics of abuse [that] can range from emotional, psychological to physical and sexual kinds of abuse and violence." Additionally, domestic violence can involve one partner isolating the other partner.

Michalski further explained that there were particular characteristics that define victims of domestic violence, including minimization of the abuse, denial of being in such a relationship, and feelings of isolation. Victims often blame themselves for the abuse, believing that if they had handled a situation differently, the partner would not have gotten so upset. And while victims often want the abuse to end, they may not want the relationship to end. As such, they are willing to forgive and do not want their partner to go to jail or get into trouble.

There are often characteristics of offenders, as well, such as getting involved romantically and seriously very early on in the relationship, exhibiting controlling behaviors which are initially masked as a sense of concern, and minimizing and denying accountability for behaviors. Offenders often blame the victims, making them feel bad or guilty about what has happened. In fact, Michalski explained that if an offender is arrested and taken to jail, they will often call their victim, asking the victim to accept responsibility for the situation and to "fix" the problem. Michalski also testified that offenders often act differently in public than they do in private so that it is very hard to identify them as someone who is abusive or violent in their relationships.

Michalski further testified about strangulation and how the act of strangulation is generally carried out. She explained how little pressure is necessary to start affecting the blood and oxygen flow to and from the brain. Michalski testified that the medical signs and symptoms of strangulation can vary; however, most of the time there are few, if any, obvious bodily injuries. There can be bruising, scratches, or redness on the neck, coughing or wheezing, confusion, pain in the neck area, difficulty swallowing, or the occurrence of urination. Other possible signs of strangulation are "petechial hemorrhage" and "linear vascular congestion." Michalski defined the term "petechial hemorrhage" as "small flat red areas or dots that are caused from pressure when the neck is squeezed." She indicated that, often, "the best place to see petechiae . . . is in the whites of the eyes or anywhere above the level of where the compression has occurred." She defined the term "linear vascular congestion" as the breaking of blood vessels due to pressure being exerted on the neck, which would be most noticeable in the eyes. Michalski emphasized that strangulation is potentially lethal. Despite the seriousness of strangulation, many victims will not report having been strangled because they feel better very quickly after the pressure is released from their neck and because, due to the

lack of oxygen, victims can sometimes suffer from a loss of memory.

Michalski testified that she had neither met with nor interviewed J.K. or Schramm. She had also not read any police reports about the August 28, 2017, incident. However, Michalski had viewed four photographs taken of J.K.'s eyes shortly after the incident, although Michalski testified that she did not know that the photographs were of J.K.'s eyes. Michalski explained that in the photographs, she observed linear vascular congestion, which can be consistent with strangulation. However, Michalski explained that things other than strangulation can cause linear vascular congestion, including sneezing, coughing very hard, or "anything that creates a pressure." In order to determine with precision the exact cause of linear vascular congestion, a medical professional would have to know a person's medical history and have an understanding of a person's current circumstances. During cross-examination, Michalski admitted that an exact cause of linear vascular congestion could not be determined by merely looking at a few photographs. In addition, she explained that she is not qualified to determine an exact cause of linear vascular congestion because she is not a diagnosing physician.

After hearing all of the evidence, the jury found Schramm guilty of strangulation. The district court ordered a presentence report to be completed and subsequently sentenced Schramm to 2 years' imprisonment followed by 12 months' postrelease supervision.

Schramm appeals his conviction and sentence here.

III. ASSIGNMENTS OF ERROR

On appeal, Schramm assigns four errors. He alleges that the district court erred in denying his motion to continue the trial so that he could obtain his own expert witness, in permitting Michalski to testify as an expert on domestic violence and strangulation over his objections, in instructing the jury, and in imposing an excessive sentence.

## IV. ANALYSIS

### 1. Schramm's Motion to Continue Trial

#### (a) Additional Background

On March 19, 2018, approximately 3 weeks before trial was to begin, the State filed a motion to endorse Michalski as an additional witness. At a hearing on the State's motion, which was held approximately 10 days after the motion was filed, the State indicated that it had given Schramm's counsel notice that "[it] was thinking about calling [Michalski] as a witness on March 1st and then . . . maybe a few days later or a week later . . . did inform [counsel] that [it] was in fact intending on calling her as a witness." Schramm's counsel did not dispute the State's explanation of the timeline; however, counsel did argue that initially, the State had indicated that Michalski was not going to offer any opinions specific to this case. However, the day before the hearing, which was less than 2 weeks prior to the scheduled trial, the State informed counsel that Michalski had looked at photographs of J.K.'s eyes and was going to opine that redness in the eyes could be consistent with strangulation. Counsel stated:

> [T]his is kind of the eleventh hour before trial. We are getting - first she wasn't going to offer any opinions and wasn't going to look at any reports. Now, I find out as of yesterday morning that she has looked at reports and now offer a medical opinion.
>
> So, that is kind of the eleventh hour for me to find out about that. Now I got to find - if you are going to allow her to testify, I have got to scramble to find someone to look at these reports and I got phone calls into doctors trying to find - in case you allow her to testify.

Ultimately, the district court sustained the State's motion to endorse Michalski as a witness.

At a separate hearing held on April 5, 2018, which was 4 days before the trial was to begin, Schramm's counsel made an oral motion to continue the trial. Counsel indicated that he was "running into problems finding expert witnesses" who

could dispute the opinion provided by Michalski regarding the condition of J.K.'s eyes. Specifically, counsel explained:

> I tried to find somebody locally. I went to [one forensic institute located in Nebraska]. I took reports and the same thing . . . Michalski looked at, the videos. [The forensic expert] contacted me yesterday. He has an opinion but he cannot help me. It's a scheduling thing. I don't know. He just can't come and he is sorry.
>
> So now, I have Thursday and Friday and the trial on Monday to find someone else and doctors are busy. It is hard to find experts.
>
> . . . .
>
> I did make a call today. I would ask to continue this so I can locate a witness and I did make a call today to another witness in Kansas City and got her voicemail. I don't know if I got a call when I get back, don't know her availability, I don't know anything. But I am pretty sure this short amount of notice, this doctor is not going to be available.

The State opposed Schramm's motion to continue the trial. The State indicated that it had informed defense counsel about Michalski "about a month ago"; however, the State did not dispute that it had not informed counsel about Michalski's testifying as to her medical opinion regarding the condition of J.K.'s eyes until about March 27, 2018. The State asserted that it had spent a significant amount of money in arranging for J.K. to fly from the Czech Republic, where she was then living, to Lincoln so that she could testify. The State asserted that J.K. was already on the plane and en route to Nebraska in anticipation of the trial which was to begin in 4 days.

The court denied Schramm's motion to continue the trial. The court stated, "We will proceed with trial[;] you still have four or five days to locate an expert if that is what you choose to do."

Prior to Michalski's testimony at trial, Schramm again brought up his motion to continue the trial. Defense counsel

indicated that he had not had an acceptable amount of time to secure his own expert witness, even though he had "diligently tried to find people." The district court overruled Schramm's objections to Michalski's testifying.

On appeal, Schramm argues that the district court abused its discretion in denying his motion to continue the trial so that he could obtain his own expert medical witness to refute Michalski's testimony about the condition of J.K.'s eyes. Upon our review, we conclude that Schramm's assertion has merit.

### (b) Standard of Review

[1,2] A decision whether to grant a continuance in a criminal case is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Ash*, 286 Neb. 681, 838 N.W.2d 273 (2013). A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for disposition. *Id*.

### (c) Analysis

Although not mentioned by either party, it must be noted that Neb. Rev. Stat. § 25-1148 (Reissue 2016) provides, in pertinent part:

> Whenever application for continuance or adjournment is made by a party or parties to any cause or proceeding pending in the district court of any county, such application shall be by written motion entitled in the cause or proceeding and setting forth the grounds upon which the application is made, which motion shall be supported by the affidavit or affidavits of person or persons competent to testify as witnesses under the laws of this state, in proof of and setting forth the facts upon which such continuance or adjournment is asked.

Not only was the application for continuance in this case made by oral motion, the motion was not supported by affidavits.

[3] However, the failure to comply with the provisions of § 25-1148 is but a factor to be considered in determining whether a trial court abused its discretion in denying a continuance. *State v. Santos*, 238 Neb. 25, 468 N.W.2d 613 (1991). Here, the motion for continuance was made at a hearing held approximately 1 week after the district court had granted the State's motion to endorse Michalski as a witness. According to both defense counsel and the State, the motion to continue was made only 1 week after defense counsel had learned that Michalski would be providing a medical opinion regarding the condition of J.K.'s eyes based upon photographs taken on August 28, 2017. As such, the motion was made at a time when, after 1 week of searching, Schramm had been unable to secure his own expert witness to testify. Given that Schramm made the oral motion to continue at his next appearance before the district court and given the close proximity in time to the start of the trial, we cannot say that the oral nature of the motion is, in and of itself, a sufficient basis upon which to declare that the district court did not abuse its discretion in denying the continuance. Moreover, while supporting affidavits may have been useful to confirm Schramm's efforts at finding an expert witness, we recognize that Schramm was under strict time constraints and, as such, do not find that the failure to include the affidavits is, under these circumstances, fatal to his motion.

[4] We thus move on to a consideration of the merits of the continuance request. The general rule, which has been articulated by the Nebraska Supreme Court, is that a continuance must be granted to allow defense counsel adequate time to prepare a defense. See *Dolen v. State*, 148 Neb. 317, 27 N.W.2d 264 (1947). See, also, *State v. Santos, supra*. Our analysis of whether the district court abused its discretion in denying Schramm's motion to continue the trial centers on whether he was provided with sufficient notice regarding Michalski's testimony such that he had adequate time to prepare his defense. Ultimately, we conclude that Schramm did

not receive sufficient notice of Michalski's testimony and that he should have been granted a continuance of trial in order to prepare his defense.

[5,6] A criminal defendant has constitutional and statutory rights which mandate the timely disclosure of the State's evidence in a criminal case. *State v. Ash*, 286 Neb. 681, 838 N.W.2d 273 (2013). In fact, Neb. Rev. Stat. § 29-1912(2) (Reissue 2016) requires the State, upon request, to disclose evidence that is material to the preparation of a defense. See *State v. Ash, supra*. In *State v. Kula*, 252 Neb. 471, 486, 562 N.W.2d 717, 727 (1997), the Nebraska Supreme Court held:

> [W]hether a prosecutor's failure to disclose evidence results in prejudice depends on whether the information sought is material to the preparation of the defense, meaning that there is a strong indication that such information will play an important role in uncovering admissible evidence, aiding preparation of witnesses, corroborating testimony, or assisting impeachment or rebuttal.

In this case, while it is true that the State did, eventually, endorse Michalski as a witness and, then later, did inform Schramm that Michalski would be offering her expert medical opinion regarding the condition of J.K.'s eyes after the August 28, 2017, incident, it is also true that the State made these disclosures very close in time to the scheduled trial date. Although the State contends that it mentioned the possibility of Michalski's testifying to defense counsel on March 1, 2018, approximately 5 weeks prior to trial, the State did not file its motion to endorse Michalski as a witness until March 19, which was approximately 3 weeks prior to trial. Moreover, as Schramm asserts, and the State does not dispute, the State did not inform Schramm until March 27, or approximately 10 days prior to trial, that Michalski would be offering opinion testimony regarding the specific facts of this case. We find that such opinion testimony is clearly material to the preparation of Schramm's defense, particularly when the bulk of the remaining evidence offered at trial amounted to only J.K's version

of events and Schramm's version of events, with Michalski's testimony clearly corroborating J.K.'s version.

Given the State's late disclosure that Michalski would be testifying, and its even later disclosure about what Michalski would be testifying about, Schramm was left with approximately 10 days to locate a person with expertise in the area of strangulation and linear vascular congestion, to provide that person with the materials sufficient for an opinion to be rendered, to determine whether that person may dispute Michalski's opinion, and to secure that person's attendance at trial. We do not disagree with Schramm's contention that it would be very difficult, if not impossible, to secure such a medical opinion in such a limited timeframe.

[7] In its brief on appeal, the State argues that Schramm has failed to demonstrate that he was in any way prejudiced by the district court's denial of his motion to continue the trial. Specifically, the State asserts that Schramm has failed to explain "what another expert would have countered with" and how such testimony would have been helpful to his defense. Brief for appellee at 21. We recognize that the Nebraska Supreme Court has previously held that there is no abuse of discretion by a court in denying a continuance unless it clearly appears that the defendant suffered prejudice as a result thereof. See *State v. Bradley*, 236 Neb. 371, 461 N.W.2d 524 (1990). See, also, *State v. Bruna*, 12 Neb. App. 798, 686 N.W.2d 590 (2004). However, we must disagree with the State's contention that Schramm's argument must fail because he did not demonstrate any specific prejudice in his trial strategy. Under the circumstances of this case, Schramm did not even have enough time to determine whether an expert could assist in his defense because he did not have adequate time to find an expert, to have that expert evaluate the evidence, and to provide Schramm with any opinion. As such, it is impossible to know whether Schramm suffered any prejudice in his trial strategy because we do not know what a potential expert might have testified to. The fact that Schramm did not have enough

time to consult with an expert and to then move forward with his trial strategy caused him prejudice.

Moreover, although Schramm was able to cross-examine Michalski regarding her medical opinion and was able to flesh out both that Michalski was not qualified to diagnose a specific condition and that there were other possible causes of the linear vascular congestion present in J.K.'s eyes besides strangulation, Michalski was still able to testify that in her expert medical opinion, the appearance of J.K.'s eyes in the photographs was consistent with being strangled. Schramm should have had an opportunity not only to soften the impact of this testimony during cross-examination, but also to attempt to hire an expert of his own who could potentially either refute or diminish the impact of Michalski's testimony.

The State also argues on appeal, as it did in the district court, that it had expended a great deal of money in reliance on the scheduled trial date and that Schramm was aware of this expenditure. We recognize that the State did spend a not insignificant amount of money in paying for the travel expenses of J.K. We also recognize that by the time Schramm made his oral motion to continue, J.K. was, apparently, already on a plane en route to Nebraska from the Czech Republic. However, we do not find that the State's monetary investment outweighs Schramm's right to be able to present a defense to the State's case against him. We also note that it was the State which added Michalski to its witness list close in time to the trial and which did not disclose the full extent of her testimony until approximately 10 days before the trial. The State knew of the investment it had made in securing J.K.'s presence presumably before it made these changes to its trial strategy. And, moreover, the State should have known that these material changes would affect the trial strategy of the defense.

Upon our review of the totality of the circumstances, we must conclude that Schramm was not provided with adequate time to prepare his defense. Specifically, he was not provided

with adequate time to adjust his trial strategy to address Michalski's expert medical testimony given the limited time available to him prior to the trial. We find that the district court abused its discretion in denying Schramm's motion to continue the trial.

[8] Having concluded that the denial of the motion to continue was reversible error, we must determine whether the totality of the evidence admitted by the district court was sufficient to sustain Schramm's conviction; if it was not, then double jeopardy forbids a remand for a new trial. See *State v. Ash*, 286 Neb. 681, 838 N.W.2d 273 (2013). But the Double Jeopardy Clause does not forbid a retrial so long as the sum of all the evidence admitted by a trial court, whether erroneously or not, would have been sufficient to sustain a guilty verdict. *State v. Ash, supra*.

After reviewing the record, we conclude that the evidence presented at trial was sufficient to support the verdict against Schramm. As such, we conclude that double jeopardy does not preclude a remand for a new trial, and we therefore reverse, and remand for a new trial.

## 2. Schramm's Other Assigned Errors

Our determination that the district court committed reversible error by failing to grant Schramm a continuance in order to attempt to secure his own expert witness resolves this appeal. While we are not required to consider Schramm's additional assignments of error, see *White v. Board of Regents*, 260 Neb. 26, 614 N.W.2d 330 (2000), and *In re Interest of Battiato*, 259 Neb. 829, 613 N.W.2d 12 (2000) (appellate court is not obligated to engage in analysis not needed to adjudicate case and controversy before it), we may, at our discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings, see *State v. Edwards*, 286 Neb. 404, 837 N.W.2d 81 (2013). We will therefore address Schramm's assertions regarding the admissibility of Michalski's testimony and whether the district court

correctly instructed the jury, as those issues are likely to recur on remand.

### 3. ADMISSIBILITY OF MICHALSKI'S TESTIMONY

#### (a) Additional Background

Once Schramm learned that the State was indeed planning on calling Michalski as a witness at trial, he filed a motion asking the court to hold a *Daubert*/*Schafersman* hearing in order to determine whether Michalski qualified as an expert witness. See *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001). In the motion, Schramm generally asserted that the "[e]xpert opinions regarding domestic violence and strangulation testimony, specifically the testimony of Susan Michalski RN, MS SANE/FNE, . . . does not meet the standard for admissibility required . . . ." Schramm also filed a motion which asserted that Michalski's testimony should not be admitted because it was not relevant and because any probative value was substantially outweighed by the danger of unfair prejudice.

A hearing was held on Schramm's motions prior to trial. At the hearing, Michalski testified to substantially the same information as she testified to during the trial, which we detailed in the background section above. She did explain during her testimony at the hearing that she has previously qualified to testify as an expert on domestic violence and/or strangulation on 11 previous occasions. After Michalski testified, Schramm argued that she is not an expert on domestic violence or strangulation. He asserted that she is only a registered nurse and not a diagnosing physician, that she "has not had enough continuing education to stay up on this topic," and that she has been merely a "trainer" for the past few years. He also asserted that Michalski should not be permitted to testify that J.K. was telling the truth, which he believed was "all . . . Michalski is going to do." Schramm asserted that

the jurors would understand what strangulation is without Michalski's explaining it to them.

After the hearing, the district court entered an order finding that "Michalski is qualified as an expert in the areas of domestic violence and strangulation by her knowledge, skill, experience, training, and education." The court further found that Michalski's "specialized knowledge in these areas . . . will assist a trier of fact in understanding the evidence and/or determining a fact in issue." The court noted that it did "not believe that characteristics of a perpetrator and/or victim of domestic violence are common knowledge. Nor does the court expect that a lay person knows the physical effects of strangulation and/or the signs and symptoms typically associated with strangulation."

Prior to Michalski's testimony at trial, Schramm renewed his objection to her testimony. The district court overruled his objection and permitted Michalski to testify as an expert. On appeal, Schramm challenges the district court's finding that Michalski was qualified to testify as an expert.

### (b) Standard of Review

[9] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Herrera*, 289 Neb. 575, 856 N.W.2d 310 (2014). The standard for reviewing the admissibility of expert testimony is abuse of discretion. *Id*. We review the record de novo to determine whether a trial court has abdicated its gatekeeping function when admitting expert testimony. *Id*.

### (c) Analysis

In his brief on appeal, Schramm asserts that the district court erred in permitting Michalski to testify as an expert witness. Specifically, Schramm argues that Michalski's "testimony was not scientific, technical or specialized in that it would have assisted the trier of fact to understand the evidence. Neither

did she have the knowledge, skill, experience, training or education required to qualify her as an expert witness on the evidence that was . . . admitted in this trial." Brief for appellant at 13. Upon our review, we find that the district court did not err in permitting Michalski to testify as an expert on the subject of strangulation.

The Nebraska Evidence Rules provide: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2016). In *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), the Nebraska Supreme Court adopted the standards which the U.S. Supreme Court set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), to determine whether expert testimony is admissible under § 27-702.

[10] Under the principles set forth in *Daubert/Schafersman*, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. *State v. Herrera, supra*. If the opinion involves scientific or specialized knowledge, trial courts must also determine whether the reasoning or methodology underlying the expert's opinion is scientifically valid. *State v. Casillas*, 279 Neb. 820, 782 N.W.2d 882 (2010). Several nonexclusive factors are considered in making this determination: (1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance within a relevant scientific community. *State v. Herrera, supra*. In order to properly conduct appellate review, it is the duty of the trial court to adequately demonstrate by

specific findings on the record that it has performed its gate-keeping functions. *State v. Casillas, supra.*

[11] A challenge to the admissibility of evidence under *Daubert/Schafersman* should take the form of a concise pre-trial motion. *State v. Herrera*, 289 Neb. 575, 856 N.W.2d 310 (2014). It should identify, in terms of the *Daubert/Schafersman* factors, what is believed to be lacking with respect to the validity and reliability of the evidence and any challenge to the relevance of the evidence to the issues of the case. *Id.* In order to preserve judicial economy and resources, the motion should include or incorporate all other bases for challenging the admissibility, including any challenge to the qualifications of the expert. *Id.*

Schramm's motion requesting that the district court hold an evidentiary hearing to determine the admissibility of Michalski's testimony pursuant to the *Daubert/Schafersman* factors did not reference any specific factor which he believed was lacking with respect to Michalski's testimony. Rather, the motion very generally asserted that Michalski's testimony "does not meet the standard for admissibility." In its order, the district court noted the deficiency in the motion, indicating that Schramm had "failed to sufficiently call into question the reliability or validity of any aspect of . . . Michalski's anticipated testimony. He has not called into question the factual basis, data, principles, or methods underlying . . . Michalski's anticipated testimony." Despite the shortcomings with Schramm's motion, the district court went on to analyze whether Michalski's testimony was admissible pursuant to the entire *Daubert/Schafersman* framework.

On appeal, Schramm argues that Michalski's testimony did not meet the requirements of § 27-702, and even if it did, it was inadmissible under *Daubert/Schafersman.* Our review of these arguments is complicated by the fact that Schramm has not identified the specific testimony that he claims was erroneously admitted. He refers only to testimony regarding "strangulation," brief for appellant at 13, and complains

that Michalski "was allowed to testify and offer an opinion to issues that were central to this case," *id.* at 14. He does not, however, identify what that opinion was. He has also not identified which prong of the *Daubert*/*Schafersman* analysis is lacking. We recognize that Schramm was hindered in his presentation of evidence at the *Daubert*/*Schafersman* hearing due to the untimely designation of Michalski and her proposed testimony; however, we are limited to the record before us in reviewing the district court's decision. Based upon the evidence presented at the pretrial hearing, we find no error in the district court's order allowing Michalski's testimony.

### 4. Jury Instructions

#### (a) Additional Background

Schramm requested that the district court include an additional jury instruction related to analyzing the credibility of expert testimony. The language of the proposed instruction read as follows:

> You have heard testimony from an expert witness. It is up to you to determine the validity and weight of the scientific testimony. Factors you should consider are:
>
> (1) Whether the theory or technique can be, and has been, tested;
>
> (2) Whether the theory or technique has been subjected to peer review and publication;
>
> (3) The known or potential rate of technique has been subjected to peer review and publication;
>
> (4) The general acceptance of the theory or technique in the scientific community.

The State objected to Schramm's proposed jury instruction. It argued that jury instruction No. 9, as authored by the court, was sufficient to instruct the jury regarding evaluating the credibility of an expert witness. Jury instruction No. 9 read as follows:

> A witness who has special knowledge, skill, experience, training, or education in a particular area may testify

as an expert in that area. You determine what weight, if any, to give to an expert's testimony just as you do with the testimony of any other witness. You should consider the expert's credibility as a witness, the expert's qualifications as an expert, the sources of the expert's information, and the reasons given for any opinions expressed by the expert.

Accord NJI2d Crim. 5.4. Ultimately, the district court rejected Schramm's proposed jury instruction and did not include it in the instructions read to the jury. Schramm appeals from the district court's decision.

### (b) Standard of Review

[12] Whether jury instructions given by a trial court are correct is a question of law. When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below. *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017).

[13,14] In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Id*. All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *Id*.

### (c) Analysis

On appeal, Schramm argues that the district court erred in rejecting his proposed jury instruction. He asserts that the proposed instruction provided the jury with a more detailed explanation than jury instruction No. 9 regarding how to evaluate expert witness testimony. He asserts that this instruction is a correct statement of the law and would have assisted the jury during its deliberations. Specifically, he states, "The

prejudice to [Schramm] is readily apparent. The impact of the jury being improperly instructed with respect to the credibility and weight to give expert testimony is fathomless." Brief for appellant at 19. Upon our review, we conclude that the district court's refusal to give the proposed jury instruction did not constitute reversible error.

[15] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Rothenberger*, 294 Neb. 810, 885 N.W.2d 23 (2016).

[16] Here, the district court used a pattern jury instruction regarding the jury's evaluation of the credibility of an expert witness. See NJI2d Crim. 5.4. Whenever an applicable instruction may be taken from the Nebraska Jury Instructions, that instruction is the one which should usually be given to the jury in a criminal case. *State v. Morgan*, 286 Neb. 556, 837 N.W.2d 543 (2013). Schramm requested that the district court depart from the pattern jury instruction and provide the jury with a more detailed explanation of how to evaluate the credibility of an expert witness. However, Schramm's proposed jury instruction asked the jury to consider the underlying principles of Michalski's testimony. In fact, Schramm's proposed jury instruction asked the jury to consider the exact *Daubert*/*Schafersman* factors that the trial court is to use in determining whether the reasoning or methodology underlying the expert's opinion is scientifically valid and, thus, in determining whether an expert can testify before a jury. In this case, as we discussed more thoroughly above, the district court had performed its proper gatekeeping function and had determined that Michalski's testimony was admissible pursuant to the *Daubert*/*Schafersman* factors. It was not the province of the jury to review the district court's decision. Rather, the jury was to evaluate the credibility of the expert witness and to

determine what weight to give the expert's testimony, just as it was to do with any other witness.

The district court did not err in utilizing the pattern jury instruction to instruct the jury on how to evaluate the credibility of expert testimony. Such an instruction was a correct statement of the law and did not prejudice Schramm in any way.

## V. CONCLUSION

Because the district court failed to grant Schramm's motion to continue the trial and, thus, failed to provide Schramm with adequate time to prepare his defense, the judgment and sentence of the district court are reversed and the cause is remanded for a new trial.

Reversed and remanded for a new trial.